```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                       EASTERN DIVISION
```

Sacha Lea Moore,                        :

    Plaintiff,                       :

  v.                                    :     Case No. 2:14-cv-911

                                                     :     JUDGE MICHAEL H. WATSON
Commissioner of Social Security,        Magistrate Judge Kemp
                                                     :

    Defendant.                       :

                    REPORT AND RECOMMENDATION

                    I.  Introduction

    Plaintiff, Sacha Lea Moore, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on August 27, 2011, and alleged that Plaintiff became disabled on July 31, 2011.

    After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on January 31, 2013.  In a decision dated May 8, 2013, the ALJ denied benefits.  That became the Commissioner's final decision on May 30, 2014, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on September 22, 2014.  Plaintiff filed her statement of specific errors on October 27, 2014, to which the Commissioner responded on January 30, 2015.  No reply brief has been filed, and the case is now ready to decide.

    II.  Plaintiff's Testimony at the Administrative Hearing

    Plaintiff, who was 39 years old at the time of the administrative hearing and who has a high school education with some college, testified as follows.  Her testimony appears at pages 43-69 of the administrative record.

Plaintiff had not worked since her onset date.  She had applied for part-time positions as either an administrative assistant or in data entry, but was unsuccessful.  Back in 1998, she had been an area manager for a trucking company.  That was a sedentary job but she was on the telephone constantly.  She then had various administrative assistant jobs through a temporary services agency and held a customer service position with a company called MP Total Care.  She had a similar position with Verizon and then did billing for an ambulance company.  She worked in customer service for a bank as well, and as an administrative assistant with Vocational Alternatives assisting both the finance and information technology departments.  Her last job was with a middle school, where she was both an administrative assistant and a receptionist.

Plaintiff testified that she could no longer work due to difficulty being out in public, dealing with others, and staying focused on tasks.  She explained that this was a life-long problem, and that the gaps in her employment history represented times when she could not cope with this issue.  She had had occasional panic attacks, triggered by stress.  She did not have any friends with whom she interacted directly.  She was able to drive her children to and from school but left the house otherwise only for doctors' appointments.

As far as treatment was concerned, Plaintiff was seeing both a psychiatrist and a counselor.  She took six different medications, which caused her to be tired on a daily basis.  On a daily basis, Plaintiff drove her children to school, used a computer, watched television, and sometimes cooked meals.  She did other chores with help from her children.  Plaintiff was able to play Scrabble online with others, and she attempted to go to school functions.  She attributed her low energy to lack of sleep as well, and she napped two or three days per week.  She was also

depressed and had frequent crying spells.  Change also bothered her.

### III.  The Medical Records

The medical records in this case are found beginning on page 267 of the administrative record.  The pertinent records can be summarized as follows.

Plaintiff was seen in the emergency room on June 5, 2010, complaining of tiredness, which had begun a month previously when she fell and hit her head in the bathtub.  She also reported an increase in the frequency of her migraine headaches.  She was diagnosed with post-concussive syndrome and was discharged with medication and a recommendation for further treatment.  (Tr. 270-71).  She was then treated by Dr. Logan, who prescribed rest and medication, but she had not improved when seen on June 18, 2010.  (T4. 274).  By July 16, 2010, she was doing somewhat better but still was affected by loud noises and was dizzy when she moved.  Adderall had helped her concentration, however.  (Tr. 281).  She went back to work that month, and by September was still working although she reported being fatigued easily and having intermittent headaches.  (Tr. 284-87).

Dr. Reece, a psychologist, performed a consultative evaluation on October 10, 2011.  Plaintiff reported that her disability was due to anxiety and depression.  She did not mention any medical problems.  She was seeing a counselor at Pickerington Area Counseling and had been hospitalized twice for psychiatric reasons, but not since 2004.  She told Dr. Reece she quit working due to stress.  Dr. Reece observed that she trembled and shook her leg during the evaluation, spoke in an exaggerated tone, exhibited some eccentric and impulsive behaviors, and made only inconsistent eye contact.  Her mood was dysphoric.  Plaintiff reported lack of sleep, crying spells, and depression, with feelings of hopelessness, helplessness, and worthlessness.

Many things made her anxious.  She heard voices but had no visual hallucinations.  She also had intrusive memories and flashbacks of earlier abuse.  Dr. Reece diagnosed major depressive disorder, severe, with psychotic features and PTSD.  He rated her GAF at 58 and concluded that she could understand, remember, and carry out instructions and had no problems with concentration.  He noted that Plaintiff reported no issues in the past with supervisors and coworkers, and said that "[h]er depression and anxiety would affect her coping responses to stress in the work place."  (Tr. 292-96).

Plaintiff had been receiving treatment for generalized anxiety from her family doctor for some time.  A note dated October 12, 2011, indicated that her symptoms had not improved much with both Paxil and Wellbutrin.  She reported problems sleeping and increased anxiety, and said that weekly counseling was not helping.  In November she stated that she still had issues with focus, concentration, and memory.  By December, she had discontinued her Wellbutrin and felt worse.  (Tr. 298-323).

Dr. Sisson also performed a consultative psychological examination, done on March 1, 2012.  Plaintiff's main complaint continued to be anxiety, although she also reported being diagnosed with PTSD, bipolar disorder, and OCD.  She was taking Paxil, amitriptyline, and Wellbutrin on a daily basis.  Her reported symptoms included crying, sleeping a lot, decreased energy, appetite disturbance, mood swings, flashbacks, anxiety, panic attacks, and fear of leaving home.  She had not been able to leave home for counseling.  She was taking online college courses.  Dr. Sisson noted that Plaintiff appeared significantly anxious throughout the interview and had a flat affect.  Plaintiff also told Dr. Sisson about her hallucinations, which had been present most of her life.  She had a fear of driving.  Dr. Sisson viewed Plaintiff as generally a reliable reporter of

symptoms.  Dr. Sisson diagnosed bipolar disorder, severe, with psychotic features, anxiety disorder, and PTSD, and rated Plaintiff's GAF at 50.  She thought Plaintiff could understand and follow basic work instructions; could maintain attention and concentration in a structured work environment; would have problems interacting with others if her symptom level were high; and could respond appropriately only to a low stress work setting.  (Tr. 324-37).  The GAF rating of 50 is also reflected in an initial psychiatric evaluation done on November 7, 2012.  (Tr. 396).

    Dr. Meiring, Plaintiff's general practitioner, completed a physical capacity form on July 20, 2012.  He said that she could stand and walk for six hours and sit for eight in a workday, frequently lift and carry up to 20 pounds, and occasionally bend, squat, crawl, and climb.  He noted that Plaintiff's problems were predominately psychological in nature.  (Tr. 338-39).  Dr. Meiring also evaluated Plaintiff's psychological capacity, concluding that she had many moderate to marked limitations, with the most severe being her ability to deal with the public, interact with supervisors, deal with work stress, function independently, maintain attention and concentration, and deal with complex job instructions.  He attributed her difficulties to a marked level of anxiety which affected her concentration and focus, thought she might improve with treatment, and noted that her problems had gotten significantly worse since July, 2011.  (Tr. 340-42).  He also rated her abilities in the four "B" criteria as involving slight restrictions in activities of daily living, moderate difficulties in social functioning, and extreme difficulties in the areas of concentration, persistence, and pace, and decompensating in work settings.  (Tr. 343).

    Plaintiff reported panic attacks in 2012, and was treated for one of them at the emergency room.  The triggering event was

apparently a school schedule that differed from Plaintiff's expectations plus stress involved in her children returning to school for the Fall. She had not seen her counselor or psychiatrist in several months and said she forgot to take her medication at times. She was treated and released. (Tr. 407-10).

The last medical record in the file is an assessment of Plaintiff's mental capacity done by her treating psychiatrist, Dr. Stearns. His view was that Plaintiff was either markedly or completely limited in her performance of every function related to working, and that the only area where her restrictions were only moderate was maintaining her personal appearance. He, too, evaluated the "B" criteria and found marked or extreme limitations in all four areas addressed by those criteria. (Tr. 417-20).

There are also state agency decisions pertinent to Plaintiff's claim. Dr. Lewin, a psychologist, concluded on November 1, 2011, that Plaintiff suffered from affective and anxiety disorders, and Dr. Lewin gave great weight to Dr. Reece's evaluation. Based on that evaluation, Dr. Lewin found that Plaintiff was moderately limited in her ability to adapt to changes in the work setting but that she could perform work not requiring frequent changes. She also had a moderate restriction in stress tolerance. (Tr. 82, 85). Dr. Hoyle, also a psychologist, found a moderate limitation in dealing with others including coworkers, supervisors, and the general public, but concluded that Plaintiff could perform simple tasks in a relatively static setting with infrequent changes. (Tr. 110-12).

### IV. The Vocational Testimony

Lynn Kaufman was the vocational expert in this case. Her testimony begins on page 69 of the administrative record.

Ms. Kaufman testified that Plaintiff's past positions were

all performed at either the sedentary or light exertional levels. Additionally, she said that they were all either skilled or semi-skilled.

Ms. Kaufman was then asked some questions about a hypothetical person of Plaintiff's age, education, and work experience who could work at the light exertional level but who had to avoid concentrated exposure to hazards such as moving machinery and unprotected heights. The person could not climb ladders, ropes, or scaffolds and could not engage in commercial driving. Finally, the person could perform only simple, repetitive tasks in a relatively static environment with no more than occasional contact with others. According to Ms. Kaufman, someone with those limitations could not do any of Plaintiff's past jobs - the skill level was too high - but could be a cleaner, small product assembler, or laundry worker. She also testified to the number of these jobs which exist in the regional, State, and national economies.

Ms. Kaufman was then asked whether someone who could not do work that involved a fast assembly line pace or strict production quotas could do those jobs. In response, she said the number of assembler jobs would be reduced but not completely eliminated. If Plaintiff were limited as described by her treating psychiatrist, however, she could not work, and the same would be true if Plaintiff's testimony about her limitations were accepted. Missing two or more days per month was also work-preclusive.

      V.   <u>The Administrative Law Judge's Decision</u>

The Administrative Law Judge's decision appears at pages 19-31 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured requirements of the Social Security Act through

-7-

the date of his decision.  Next, she had not engaged in substantial gainful activity since her allege onset date of July 31, 2011.  Going to the second step of the sequential evaluation process, the ALJ determined that Plaintiff had severe impairments including post-concussive syndrome, bipolar disorder, posttraumatic stress disorder, generalized anxiety disorder, and obsessive-compulsive disorder.  The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to perform work at all exertional levels, but could not tolerate concentrated exposure to workplace hazards, including unprotected heights and dangerous machinery, and should not climb ladders, ropes, or scaffolds, or engage in commercial driving.  Further, she could do simple, repetitive tasks in a relatively static environment where no more than occasional contact with others was required.

The ALJ found that, with these restrictions, Plaintiff could not do any of her past relevant work, but she could do the jobs identified by the vocational expert, including cleaner, assembler, and laundry worker.  The ALJ further found that such jobs existed in significant numbers in the regional, State, and national economies.  Consequently, the ALJ concluded that Plaintiff was not entitled to benefits.

### VI.  Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ improperly rejected the opinions of Plaintiff's treating physician and psychiatrist; (2) the ALJ did not give proper weight to the opinion of the consultative psychological examiner, Dr. Sisson; (3) the ALJ improperly

evaluated Plaintiff's credibility; and (4) the ALJ should have obtained the assistance of a medical expert. These claims are evaluated under the following standard.

    <u>Standard of Review.</u> Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Company v. NLRB</u>, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" <u>Id</u>. <u>LeMaster v. Weinberger</u>, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. <u>Harris v. Heckler</u>, 756 F.2d 431, 435 (6th Cir. 1985); <u>Houston v. Secretary</u>, 736 F.2d 365, 366 (6th Cir. 1984); <u>Fraley v. Secretary</u>, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" <u>Beavers v. Secretary of Health, Education and Welfare</u>, 577 F.2d 383, 387 (6th Cir. 1978) (quoting <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951)); <u>Wages v. Secretary of Health and Human Services</u>, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. <u>Kinsella v. Schweiker</u>, 708 F.2d 1058, 1059 (6th Cir. 1983).

                    A. <u>The Treating Source Opinions</u>

    Plaintiff's first claim of error is that the ALJ should not have disregarded the opinions of both Dr. Meiring and Dr. Stearns, each of whom believed that Plaintiff had restrictions on her mental functioning which, according to the vocational expert, are inconsistent with being employed. As the Court reads

-9-

Plaintiff's memorandum, the failure being alleged is not an "articulation error" - that is, the failure to explain adequately why the treating source opinions were not accepted - but a substantive error based on the claimed lack of support in the record for the reasons the ALJ gave for not accepting the treating source opinions. The Court will therefore begin by focusing on exactly why the ALJ reached his conclusions about how much weight to give those opinions, keeping the following legal principles in mind.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once. 20 C.F.R. §404.1527(c); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981). However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion. Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir. 1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

The ALJ had this to say about, first, Dr. Meiring's opinions

concerning Plaintiff's psychological restrictions.  The ALJ gave those opinions "minimal weight" for two reasons: "Dr. Meiring is a primary care physician and is not a mental health profession (sic), which renders his opinion less persuasive"; and "Dr. Meiring's opinion is not consistent with the claimant's daily activities, as discussed elsewhere, which suggest a much higher level of adaptive functioning." (Tr. 28).  The ALJ also commented, speaking about both Dr. Meiring's and Dr. Stearns' opinions, that "the possibility always exists that a doctor may express an opinion based on the individuals (sic) subjective complaints as opposed to an opinion based on purely objective findings."  Id.  The ALJ went on to give great weight to the state agency reviewers' findings, reasoning that they were "consistent with and well supported by the evidence of the record as a whole" and that they were expressed by sources who possessed "specific 'understanding of our disability programs an their evidentiary requirements'" (quoting SSR 96-6p).  (Tr. 29). Since the ALJ incorporated an earlier discussion of Plaintiff's activities of daily living, that must also be factored into his reasoning process.  The ALJ found those activities to include driving short distances up to ten times per week, completing chores, preparing meals, taking care of her personal hygiene, using a computer, playing video games, and sometimes attending school events. (Tr. 28).  Finally, it should be noted that the ALJ gave some weight to the opinion of Dr. Reece, the first consultative examiner, but found that Plaintiff was actually more limited than Dr. Reece believed, and he also gave some weight to Dr. Sisson's evaluation.

    These are the reasons given by Plaintiff why this evaluation of the treating source opinions is improper:

> The opinions of the treating sources are supported by clinical findings and are consistent with the evidence

> of the record, most notably the ongoing treatment records and are consistent with the opinion of Dr. Sisson, the psychological consultative examiner. Dr. Meiring has a longstanding treating relationship with the Plaintiff and Dr. Stearns, although he has a shorter treatment history with the Plaintiff, is a psychiatric specialist and therefore his opinion should carry great weight. Therefore, the ALJ erred by failing to give the Plaintiff's treating physician and psychiatrist proper weight and this case should be reversed and remanded.

Statement of Errors, Doc. 11, at 7. The Commissioner counters by arguing that the ALJ was permitted to discount Dr. Meiring's opinions on psychological issues because he is not a mental health professional; that Dr. Stearns' course of treatment was inconsistent with disabling symptoms; and that Plaintiff's activities of daily living showed a greater mental functional capacity than either of those sources described.

Taking the two sources in reverse order, there are not a great number of treatment notes from Dr. Stearns, and Plaintiff concedes that the treating relationship was not lengthy. The notes from those sessions (which are admittedly difficult to decipher) show various symptoms such as depression and low energy, but they do indicate that Plaintiff's anxiety, which was her major complaint, was fairly well-controlled with medication. It is accurate that she did not seek treatment from a mental health professional for a long period of time despite encouragement from Dr. Meiring, and that her medication compliance and attendance at counseling were less than optimal. Consequently, the Court finds that the ALJ's reasons for giving only minimal weight to Dr. Stearns' opinion were, while terse, adequately supported by the record.

Dr. Meiring did have a much longer treating relationship with Plaintiff, but, as the ALJ noted, he is not a mental health expert. The other reason given for discounting his views was the

inconsistency between them and the activities which Plaintiff was able to engage in on a daily basis.  Among other limitations, Dr. Meiring said that Plaintiff was markedly limited in her ability to relate to others, to deal with stress, to function independently, and to maintain attention and concentration.  He also thought she would always decompensate in or withdraw from work settings.  However, as the ALJ pointed out, Plaintiff engaged in a fairly wide range of daily activities including driving, doing household chores, and relating to other people at functions like school events.  These activities may not, of themselves, demonstrate the ability to perform the mental requirements of work on a sustained basis, but even Dr. Meiring said that Plaintiff would find it difficult to perform "most jobs" - a situation he believed would improve with mental health counseling - and the activities described by Plaintiff are not totally consistent with the marked restrictions indicated by Dr. Meiring.  The ALJ was therefore entitled to use the activities of daily living in order to discount Dr. Meiring's opinions to some degree, and to consider whether other sources - such as Dr. Reece or the state agency reviewers - expressed a more consistent view of Plaintiff's mental functional capacity.  See, e.g.,Owens v. Comm'r of Social Security, 2013 WL 1912868 (E.D. Tenn. Apr. 5, 2013)(holding that because the treating source's "marked and extreme limitations in various areas were inconsistent with Plaintiff's reports of her own daily activities and social functioning" the ALJ had a substantial basis for not giving controlling weight to the treating source opinion), adopted and affirmed 2013 WL 1909990 (E.D. Tenn. May 8, 2013).  The Court therefore finds no error in the ALJ's evaluation of the treating source opinions.

                B.   <u>Weighing Dr. Sisson's Opinion</u>

Plaintiff's argument on this point is brief.  She notes that Dr. Sisson's opinion is, overall, work-preclusive.  It is also

consistent with the treating source opinions. For that reason, she contends that it should have been accorded great weight and that the ALJ erred by not doing so.

The Commissioner argues, and the Court agrees, that this argument is an insufficient basis upon which to remand the case. The ALJ neither had to give Dr. Sisson's opinions controlling weight, even if they were uncontradicted by other evidence, nor follow the articulation rule found in 20 C.F.R. §404.1527(c) as interpreted by Wilson, supra, because Dr. Sisson was not a treating source. The ALJ did accept portions of Dr. Sisson's opinion, giving some weight to her conclusions, but the ALJ also found (properly) that the treating source opinions which, according to Plaintiff, support Dr. Sisson's conclusions were not a true indicator of Plaintiff's mental functional capacity. The ALJ also had, and articulated, reasons for concluding that Plaintiff's report of psychotic symptoms such as hallucinations was not entirely credible. Essentially, Plaintiff disagrees with the weight which the ALJ chose to give to this particular consultative opinion, but "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary if his decision is supported by substantial evidence." Hays v. Sullivan, 907 F.2d 1453, 1456 (6th Cir. 1990). Because the record contained facts which a reasonable person could both credit and find to be inconsistent with some of Dr. Sisson's more extreme opinions, the ALJ had a substantial basis for giving only some weight to those opinions.

### C. The Credibility Finding

Next, Plaintiff contends that the ALJ did not properly evaluate her credibility. She asserts that her activities of daily living, which she has tailored to her psychological limitations, are not consistent with an ability to perform work on a sustained basis, and that she has consistently reported

disabling symptoms to a variety of health care providers. Consequently, she argues, the ALJ did not have a substantial basis upon which to discredit her testimony.

A social security ALJ is not permitted to reject allegations of disabling symptoms, including pain, solely because objective medical evidence is lacking. Rather, the ALJ must consider other evidence, including the claimant's daily activities, the duration, frequency, and intensity of the symptoms, precipitating and aggravating factors, medication (including side effects), treatment or therapy, and any other pertinent factors. 20 C.F.R. §404.1529(c)(3). Although the ALJ is given wide latitude to make determinations about a claimant's credibility, the ALJ is still required to provide an explanation of the reasons why a claimant is not considered to be entirely credible, and the Court may overturn the ALJ's credibility determination if the reasons given do not have substantial support in the record. See, e.g. Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994).

Here, the ALJ cited to various factors which, in his view, undermined Plaintiff's credibility. They included inconsistencies in her report of symptoms, the lack of objective verification for some of her complaints, inconsistencies between her claim of disabling symptoms and her activities of daily living, her failure to report some symptoms she claimed (such as side effects of her medication), the vagueness of some of her testimony, a lack of aggressive treatment, failure to attend counseling on a consistent basis, and medication noncompliance. (Tr. 27-28).

These rationales have varying levels of support in the record, but none of them are gross mischaracterizations of either the medical records or the testimony. As the Commissioner correctly points out, the ALJ is given some leeway in making reasonable inferences from the record. See, e.g., Rutherford v. Comm'r of Social Security, 2011 WL 445092, *2 (S.D. Ohio Feb. 4,

2011). Recognizing that "[c]laimants challenging the ALJ's credibility findings face an uphill battle," Daniels v. Comm'r of Social Security, 152 Fed. Appx. 485, 488 (6th Cir. Oct. 24, 2005), this appears to be one of those cases where the Court must defer to the ALJ's decision. "The narrow scope of judicial review of the Commissioner's final administrative decision does not include re-weighing evidence, deciding questions of credibility, or substituting the court's judgment for that of the ALJ," Suesz v. Comm'r of Social Security, 2014 WL 4162555, *8 (S.D. Ohio Aug. 20, 2014), and that precludes the Court from accepting Plaintiff's argument on this issue.

### D. The Need for a Testifying Medical Expert

Plaintiff's final assignment of error addresses the ALJ's failure to retain a testifying medical expert. The primary thrust of this argument appears to be that the ALJ improperly made medical judgments and substituted his opinion for that of the medical experts whose views appear in the record. She claims that this error led to an incomplete hypothetical question being posed to the vocational expert, and to unreliable testimony as to her ability to work.

Taking this argument at face value, the Court does not agree that the ALJ abused his considerable discretion by not calling a medical expert to testify. Medical experts are required only in those cases where the medical evidence is "so complicated ... that the ALJ could no longer properly understand the entirety of the medical evidence without further specialized assistance." Rawls v. Comm'r of Social Security, 2014 WL 1091042, *6 (S.D. Ohio March 18, 2014), adopted and affirmed 2014 WL 4437290 (S.D. Ohio Sept. 9, 2014). Plaintiff has not explained what makes this case, where there are already numerous interpretations of the psychological evidence for the ALJ to have considered, an exceptional case requiring use of a testifying expert. Further, the ALJ did not simply reach a residual functional capacity

-16-

finding out of thin air; he considered the various opinions and the bases for them, assigned weight to each, and arrived at a decision which is based on the evidence of record.  Plaintiff clearly disagrees with that decision, and with the way in which the ALJ weighed the evidence, but the Court has rejected the statements of error dealing with the treating source and consultative opinion evidence, and this last assignment of error does not provide any additional reason for the Court to substitute its judgment for that of the ALJ.  For these reasons, it will be recommended that Plaintiff's statement of errors be overruled.

### VII.  Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner of Social Security.

### VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a _de novo_ determination of those portions  of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the

Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge
